| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1** | |
| **PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>John S. Mairo, Esq. (jsmairo@pbnlaw.com)<br>Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)<br>*Proposed Counsel to Debtors and Debtors-In-Possession* | |

| | |
|---|---|
| In re:<br><br>FESTIVE WORKS, LLC, *et al.*,[1]<br><br>              Debtors. | Chapter: 11<br><br>Case No.: 21-10445 (JKS)<br><br>(Joint Administration Pending) |

**MOTION OF DEBTORS-IN-POSSESSION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO THE STALKING HORSE AGREEMENT; (B) AUTHORIZING AND APPROVING EXPENSE REIMBURSEMENT RELATED THERETO; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) SCHEDULING A SALE HEARING; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession in the above-captioned chapter 11

cases (collectively, the "Debtors"), by and through their undersigned proposed counsel, hereby

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number are: Festive Works, LLC (3067) and Marco Polo & Restaurant Tavern, Inc. (6324).

6244678

submit this motion (the "Motion"), pursuant to sections 105(a), 363, 365, and 503 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1, 6004-2, and 6004-3 of the

Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local

Rules"), for entry of orders, as follows:

First, the Debtors request entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order")[2] (a) authorizing and approving the proposed bidding

procedures (the "Bidding Procedures"), substantially in the form attached to the Bidding

Procedures Order as **Exhibit 1**, in connection with the sale (the "Sale") of substantially all of the

Debtors' assets (collectively, the "Purchased Assets") pursuant to an asset purchase agreement

(together with the schedules thereto and related documents, as may be amended, supplemented, or

otherwise modified from time to time, the "Stalking Horse Agreement"), by and among the

Debtors, as sellers (each a "Seller" and collectively, the  "Sellers"), and Temple Hill Partners LLC

and Temple Hill Associates LLC, as buyers (each a "Buyer" and collectively, the "Buyers" or the

"Stalking Horse Bidder"), attached hereto as **Exhibit B**,[3] subject to higher or otherwise better

offers at an auction (the "Auction") to be held if the Debtors receive one or more timely and

acceptable Qualified Bids (as defined in the Bidding Procedures); (b) authorizing the Sellers to

pay the Buyers an expense reimbursement of up to Forty-Five Thousand and 00/100 Dollars

($45,000.00) (the "Expense Reimbursement), if and when payable pursuant to the terms of the

Stalking Horse Agreement; (c) approving procedures for the assumption and assignment of certain

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Bidding Procedures, the Stalking Horse Agreement (as defined herein), or the Kyritsis Declaration (as defined herein).

[3] Exhibit B has been bifurcated into **Exhibit B-1**, which contains the original Stalking Horse Agreement between Buyers and Sellers, as well as the First and Second Amendments thereto; **Exhibit B-2** contains an Amended and Restated Stalking Horse Agreement, which incorporates the First and Second Amendments into a single document that can be revised by Potential Bidders when submitting Bids.

6244678

of the Sellers' executory contracts and unexpired leases (the "Assumption and Assignment Procedures") and approving the form and manner of notice thereof (substantially in the form attached hereto as **Exhibit C**, the "Cure Notice"); (d) scheduling the Auction, if applicable, and a hearing to consider approval of the Sale (the "Sale Hearing"); (e) approving the form and manner of notice thereof (substantially in the form attached hereto as **Exhibit D**, the "Sale Notice"); and (f) granting related relief.

Second, the Debtors also request entry of an order, substantially in the form attached hereto as **Exhibit E** (the "Sale Order") (a) authorizing and approving the Sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests; (b) approving the assumption and assignment of the Sellers' executory contracts (each, and "Executory Contract") and unexpired leases (each, an "Unexpired Lease") related thereto; and (C) granting related relief.

In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Agapios Kyritsis in Support of the Debtors' Chapter 11 Petitions and First-Day Relief* (the "Kyritsis Declaration") and the *Declaration of Oren Klein in Support of the Bidding Procedures and Sale Motion* (the "Klein Declaration"), filed contemporaneously herewith, and respectfully represent as follows:

## BACKGROUND

1.     On January 20, 2021 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  Contemporaneously herewith, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy

6244678

Rule 1015(b).

2.      The Debtors manage one of Summit, New Jersey's longest operating restaurants, namely Marco Polo Restaurant & Tavern ("Marco Polo").  Originally founded in 1934, Marco Polo has been serving residents of Summit and the surrounding areas for over eighty (80) years. The Debtors provide a variety of services including in-person dining, take-out dining, and both personal and corporate catering as well as serving as a banquet hall venue for larger gatherings.  A downturn in revenue related to decreased business, significantly exacerbated by the ongoing COVID-19 pandemic that has drastically affected small businesses, particularly the restaurant business, has rendered the Debtors unable to meet their obligations to their secured lender and catalyzed these chapter 11 cases.

3.      A detailed description of the Debtors' businesses and facts precipitating the filing of the Debtors' chapter 11 proceedings is set forth in the Kyritsis Declaration.  Those facts are incorporated herein by reference.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 6004-1, 6004-2, and 6004-3.

6244678

## RELIEF REQUESTED

6.      By this Motion, the Debtors first seek entry of the Bidding Procedures Order, (a) authorizing and approving the Bidding Procedures, (b) authorizing and approving, if and when payable, the payment of the Expense Reimbursement, (c) approving the Assumption and Assignment Procedures and the Cure Notice, (d) scheduling the Auction and Sale Hearing, (e) approving the Sale Notice, and (f) granting related relied.

7.      Second, at the Sale Hearing, the Debtors will seek entry of the Sale Order, (a) authorizing and approving the Sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests, (b) authorizing and approving the assumption and assignment of the Sellers' Executory Contracts and Unexpired Leases related thereto, and (c) granting related relief.

8.      For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and therefore should be granted.

## EVENTS LEADING TO THE PROPOSED SALE

9.      As more fully detailed in the Kyritsis Declaration, the Debtors commenced these chapter 11 cases with the intent to conduct a sale process with respect to the Purchased Assets, pay off their indebtedness to their secured lender, and maximize the value of their assets in response to the COVID-19 pandemic that has triggered an overall downturn in business and revenue for the Debtors, rendering them unable to meet their debt obligations.

10.     On December 28, 2017, pursuant to the regulations of the Small Business Administration, the Debtors executed and delivered to Unity Bank (the "Secured Lender" or "Unity Bank") a commercial promissory note (the "Note") in the principal sum of Two Million, Eight Hundred Seventy-Nine Thousand and 00/100 Dollars ($2,879,000.00).  The Debtors' obligations

under the Note were secured by a security agreement (the "Security Agreement"), pursuant to which the Debtors granted the Secured Lender a first lien security interest in all of the Debtors' then-existing and thereafter acquired, *inter alia*, inventory, accounts, general intangibles, and fixtures, and all proceeds related thereto (collectively, as set forth in the Security Agreement, the "Collateral").

11.    A downturn in business beginning in late 2019, followed thereafter by the ongoing COVID-19 pandemic has caused the Debtors to default on their obligations to the Unity Bank.[4]

12.    As described in the Kyritsis Declaration and the Klein Declaration, AuctionAdvisors was engaged in May 2020 to market and sell the Purchased Assets, which consist of, *inter alia*, (i) the real property and improvements located at Block 402, Lots 1, 3-7 & 61-63 in Summit, New Jersey 07901 (the "Land"); (ii) all intangible personal property relating to the Land (the "Intangible Property"); (iii) all tangible personal property used in connection with the restaurant operated out of such location; and (iv) the plenary retail consumption liquor license #2018-33-011-006 ("Liquor License") for Festive Works, LLC, the owner of the Land and Intangible Property, and Marco Polo Restaurant & Tavern, Inc., the owner of the Liquor License and tangible property used in connection with the Marco Polo Restaurant & Tavern operations. Klein Declaration at ¶ 4.

13.    Immediately upon its engagement, AuctionAdvisors embarked on a robust, but targeted, campaign to cultivate prospects that were interested in purchasing either all or part of the Debtors' assets and, if possible, becoming a stalking horse bidder in connection with a potential

---

[4] Unity Bank has initiated two pending state court actions against the Debtors, one seeking to foreclose on its Collateral (the "Foreclosure Action") and the other to secure a judgment against the Debtors on account of the Note (the "Note Action"). The Foreclosure Action is pending under Docket No. UNN-F-2320-20, and the Note Action is currently pending in Hunterdon County under Docket No. HNT-L-45-20. Currently, a motion to strike the Debtors' contested answer and affirmative defenses is pending in the Foreclosure Action, and returnable on January 23, 2021; a motion for summary judgment in the Note Action is also currently pending and returnable January 23, 2021.

6244678

sale pursuant to section 363 of the Bankruptcy Code.  Id. at ¶ 5.

14.     The initial campaign to market the Purchased Assets resulted in identifying and soliciting MYR Associates, who responded favorably to AuctionAdvisors' approach.  Id. at ¶ 6. MYR Associates was interested in purchasing only the Land, and entered into extensive negotiations with the Debtors to do so.  Id.

15.     After MYR Associates was identified as a potential purchaser of the Land, AuctionAdvisors attempted to separately market the Liquor License and the Debtors' remaining tangible personal property in an effort to enhance the overall consideration for the Debtors' assets and maximize value thereof.  Id. at ¶ 7.

16.     Accordingly, concurrent with ongoing negotiations with MYR Associates, AuctionAdvisors continued to market the Debtors' assets and solicit additional prospects for the Purchased Assets as a whole, or the Liquor License and remaining tangible personal property.  Id. at ¶ 8.

17.     Those efforts resulted in identification of, and negotiations with, an additional four (4) interested parties, culminating with one of those parties, the Buyers, being recognized as the best potential suitor for the Debtors' assets.  Id. at ¶ 9.

18.     The Debtors and Buyers went through multiple rounds of negotiations, with the Buyers increasing their total offer price several times.  Id. at ¶ 10.  The Buyers' ultimate offer was for all of the Purchased Assets, negating the need to bifurcate any of the Debtors' assets and hold multiple sale processes.  Id.

19.     After thoroughly evaluating all alternative available, the Debtors, in consultation with their professionals, determined that the proposed sale of the Purchased Assets to the Buyers was the best option available to the Debtors to maximize the value of such assets for the benefit of

6244678

the Debtors' estates and creditors.  Id. at ¶ 11.

20.    The Buyers agreed to becoming the Stalking Horse Bidder in these chapter 11 cases and, on September 9, 2020, entered into the Stalking Horse Agreement (as amended on November 6, 2020 and December 18, 2020).  Id. at ¶ 12.

21.    As outlined above, the transaction negotiated with the Buyers is the culmination of a thorough, fair, arms-length and robust prepetition marketing process.  The Debtors believe that, taken as a whole, the terms of the proposed sale of the Purchased Assets to the Buyers are fair and reasonable, and that the Stalking Horse Bid represents the highest and best offer for the Purchased Assets available to the Debtors at this time, subject to any higher and otherwise better offers that may be received during any post-petition marketing process.

22.    The Debtors believe that it is critical to establish a floor for the proposed Sale of the Purchased Assets, subject to higher or otherwise better offers pursuant to an open auction process, to afford the Debtors the best opportunity to maximize the value of their estates for the benefit of their creditors and parties-in-interest.  Subject to the provisions of the Bidding Procedures, the Debtors and their professionals retain the right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates.  If the Debtors receive competitive offers based on the proposed qualification criteria in the Bidding Procedures for the Purchased Assets, the Debtors will conduct the Auction to determine the highest or otherwise best offer(s) for the Purchased Assets, subject to the Court's final approval.

23.    Accordingly, the Debtors believe that the sale of the Purchased Assets to the Buyers, or to any other Winning Bidder pursuant to the Bidding Procedures, will maximize the value of the Debtors' estates for the benefit of all of their creditors and other parties-in-interest.

6244678

## THE PURCHASED ASSETS

24.     The Purchased Assets consist of, *inter alia*, (a) certain lands lying in the City of Summit, County of Union, State of New Jersey designated as Block No. 402, Lot Nos. 1, 3 through 7, and 61 through 63 on the Tax Map of the City of Summit, Union County, New Jersey, (b) all buildings, structures, fixtures, and improvements presently located thereon (the "Improvements"), (c) all easements, licenses, rights, and appurtenances relating to the Real Property and the Improvements (the "Rights"), (d) if and to the extent assignable, all right, title, and interest of the Debtors, if any, in and to any intangible personal property relating to the Real Property and the Improvements, including, without limitation, all licenses, permits, plans, specifications, operating manuals, guarantees and warranties and any structural, engineering, soil, seismic, geologic, hydrogeologic, architectural, and other reports and studies prepared by third-party consultants relating to the Real Property and the Improvements (the "Intangible Property"), and (d) all assets, including all real and personal property, belonging to and used in the operation of Marco Polo (the "Marco Polo Assets").

## THE BIDDING PROCEDURES

25.     The proposed Bidding Procedures are designed to maximize the value of the Debtors' assets while ensuring an orderly and fair sale process.

26.     The Debtors propose that the Stalking Horse Agreement serve as the form asset purchase agreement to be provided to all prospective bidders (each, a "Potential Bidder") that desire to participate in the Bidding Process, defined below, to acquire the Purchased Assets. Among other requirements, each Potential Bidder for the Purchased Assets will be required to submit to the Sellers a Qualified Bid, as defined in the Bidding Procedures, along with an executed copy of a Proposed Asset Purchase Agreement (defined below), redlined against the Stalking

9

Horse Agreement highlighting changes and revisions thereto, indicating the terms upon which the

Potential Bidder would agree to purchase the Purchased Assets and assume certain liabilities.

### A.    The Bidding Procedures

27.    Subject to the Court's approval, the Debtors propose to establish the following

milestones and deadlines in connection with the Bidding Process (as defined below):

| Sale Dates and Deadlines | |
|---|---|
| Entry of Bidding Procedures Order | January __, 2021 |
| Deadline to Serve Sale Notice and Cure Notice | No later than three (3) business days after entry of the Bidding Procedures Order |
| Cure and Assignment Objection Deadline | No later than ten (10) days after service of the Cure Notice |
| Bid Deadline | February 17, 2021 at 4:00 p.m. (ET) |
| Sale Objection Deadline | February 17, 2021 at 4:00 p.m. (ET) |
| Deadline to Notify Qualified Bidders and Select Starting Bid | February 21, 2021 at 10:00 a.m. (ET) |
| Auction (if required) | February 22, 2021 at 10:00 a.m. (ET) |
| Deadline to object to (i) conduct of the Auction, and (ii) the proposed Sale Transaction if the Winning Bidder is not the Stalking Horse Bidder. | February 23, 2021 at 4:00 p.m. (ET) |
| Notice of Winning Bidder to be Filed | February 23, 2021 at 4:00 p.m. (ET) |
| Deadline for Reply Pleadings in Support of Sale | February 24, 2021 at 10:00 a.m. (ET) |
| Sale Hearing | February 24, 2021 at 10:00 a.m. (ET) |
| Outside Closing Date of Sale | February 26, 2021 |

28.    Among other things, the Bidding Procedures detail the procedures by which

interested parties may become Potential Bidders and submit Qualified Bids, the procedures for

receipt and negotiation of bids received, the conduct of the Auction, if necessary, the selection and

approval of the ultimately Winning Bidder, and deadlines related to the Court approval of same

and the deadline to close the Sale transaction (collectively, the "Bidding Process"). The Debtors

believe that the Bidding Process envisioned by the Bidding Procedures will result in a fair and

6244678

equitable process, and allow the Debtors the best opportunity to continue the robust prepetition

marketing and solicitation process, and enable them to maximize the value of their assets to the

benefit of all creditors.

29.     In accordance with Local Rule 6004-2(b), the material terms of the proposed

Bidding Procedures are as follows:

| Provision | Description of Provision |
|---|---|
| Requirements for Access to Phase II Environmental Report | Potential Bidders seeking access to the Phase II Environmental Report set forth in the Stalking Horse Agreement are required to submit an executed non-disclosure agreement in a form and substance satisfactory to the Debtors prior to the Bid Deadline. |
| Bid Requirements | To constitute a Qualified Bid, a Bid must, among other things:<br><br>a)  Be made in writing;<br><br>b)  Include, in a form and substance satisfactory to the Debtors, a completed and executed copy of a sale agreement which contains terms that are better than the terms of the Stalking Horse Agreement, as determined by the Debtors in consultation with their professionals, but in no event shall the aggregate Purchase Price be less than Three Million Seven Hundred Ten Thousand and 00/100 Dollars ($3,710,000.00) (a "Proposed Asset Purchase Agreement"), along with a redlined version of the Stalking Horse Agreement,[5] highlighting changes and revisions thereto, indicating the terms upon which the Potential Bidder would agree to purchase the Purchased Assets and assume certain liabilities;<br><br>c)  Be accompanied by a cash deposit[6] in an amount equal to ten per cent (10%) of the proposed aggregate Purchase Price, but in no event shall the deposit be less than Three Hundred Seventy-One Thousand and 00/100 Dollars ($371,000.00), which shall be held in a segregated account (the "Good Faith Deposit");<br><br>d)  Include written evidence reasonably acceptable to the Debtors demonstrating the appropriate corporate authorization for the Potential Bidder to enter into and consummate the Proposed Asset Purchase Agreement; |

---

[5] Such a document should be redlined against the Amended and Restated Stalking Horse Agreement, attached hereto as **Exhibit B-2**.
[6] Acceptable deposits shall be in the form of a certified or cashier's check or wire, payable to "AuctionAdvisors."

6244678

e)   Fully disclose the legal identity of each entity that will be bidding on the Purchased Assets and also disclose any connections or agreements with the Sellers;

f)   Include sufficient and adequate written evidence that the Debtors, in consultation with their professionals, reasonably conclude demonstrates that the Potential Bidder has the necessary financial ability and wherewithal to consummate the Proposed Asset Purchase Agreement on the timeline set forth in the Bidding Procedures, and provide adequate assurance of future performance under all contracts to be assumed and assigned pursuant to said Proposed Asset Purchase Agreement;

g)   Include a completed and executed copy of the Escrow Agreement, as amended, and attached to the Stalking Horse Agreement as Exhibit D, including provisions regarding "Release of Property from Escrow" and reimbursement of the Stalking Horse Bidder's deposit within five (5) days of the Closing Date;

h)   Be irrevocable through the Auction, *provided, however,* that if such a Qualified Bid is determined to be the Winning Bid or a Backup Bid, such Qualified Bid shall continue to be irrevocable, subject to the terms and conditions of the Bidding Procedures;

i)   Not be conditioned on obtaining financing, approval, or on the outcome or review of due diligence, and subject to the accuracy in all material respects of specified representations and warranties at the closing of the Sale;

j)   If the Proposed Asset Purchase Agreement is for less than all of the Purchased Assets, then to be considered a Qualified Bid, the Bid must not be less than five per cent (5%) above the amount attributed to the equivalent portion of the Purchased Assets by the Stalking Horse Agreement or otherwise Leading Bid;

k)   Be submitted in accordance with the above requirements, on or before February 17, 2021 at 4:00 p.m. (ET), or such other date as may be agreed to by the Debtors or set by this Court (the "Bid Deadline"); and

l)   Be accompanied by an affirmative statement (i) it has and will continue to comply in all respects with the Bidding Procedures; (ii) its bid does not entitle such Potential Bidder (other than the Stalking Horse Bidder) to any break-up fee, Expense Reimbursement, expense reimbursement, or any other similar type of bid protection, payment,

12

| | |
|---|---|
| | or reimbursement; and (iii) it waives any substantial contribution administration expense claims under Bankruptcy Code section 503(b) related to bidding for the Purchased Assets.<br><br>The Stalking Horse Agreement shall automatically be deemed a Qualified Bid. |
| Modification of Bidding Procedures | The Debtors may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (*e.g.*, limitations in the amount of time to make subsequent Overbids, changes in minimum overbid increments, etc.) for conducting the Auction so long as such rules do not materially alter the terms of the Stalking Horse Agreement or in the Debtors' business judgment will better promote the goals of the Bidding Process. |
| Bid Protections | In the event the Stalking Horse Bidder is not the Winning Bidder, the Stalking Horse Bidder is entitled to payment of its Expense Reimbursement pursuant to the terms of the Stalking Horse Agreement. |
| Auction | If one or more Qualified Bids (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid. If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, no Auction shall be conducted, and the Stalking Horse Agreement shall be deemed to be the Winning Bid and the Stalking Horse bidder shall be deemed to be the Winning Bidder. Only Qualified Bidders may participate in the Auction. No less than twenty four (24) hours prior to the Auction, the Debtors shall provide copies of all Qualified Bids to all Qualified Bidders, including the Stalking Horse Bidder.<br><br>The Auction shall take place on February 22, 2021 at 10:00 a.m. (ET), or such other time as the Debtors shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder, and other invitees in accordance with these Bidding Procedures. The Auction shall be conducted by video conference, the details of which will be provided to Qualified Bidders in advance of the Auction. |
| Bidding Increments / Overbids | The Stalking Horse Bidder's Qualified Bid shall constitute the "Baseline Bid." Any subsequent Qualified Bid over the Baseline Bid (each being an "Overbid") shall be made in increments determined by Debtors in consultation with their professionals, but in no event shall an Overbid be less than Fifty Thousand and 00/100 Dollars ($50,000.00), *provided, however,* that the first Overbid must be no |

| | less than Three Million Seven Hundred Ten Thousand and 00/100 Dollars ($3,710,000.00), or Two Hundred Ten Thousand and 00/100 Dollars ($210,000.00) above the Purchase Price set forth in the Stalking Horse Agreement (the "Initial Overbid").   Additional consideration in excess of the Baseline Bid may only include cash consideration.   For purposes of any Overbid, the Stalking Horse Bidder shall be entitled to credit in the amount of the Expense Reimbursement.   If the Auction is necessary, the Debtors, in consultation with their professionals, shall select the highest and best Offer from among the Qualified Bids and the Stalking Horse Bid as the opening bid (the "Opening Bid").   Any bids subsequent to the Opening Bid shall follow the Overbid procedures of this paragraph. |
|---|---|
| Return of Good Faith Deposit | The Good Faith Deposits of all Qualified Bidders shall be held in one or more segregated accounts by the Debtors but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither the Winning Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) Business Days after the Sale Hearing.   The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of one (1) Business Day after (i) the closing of the transaction with the Winning Bidder; (ii) the Outside Backup Date; or (iii) the Outside Closing Date.  If the Winning Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its Purchase Price. |
| Closing with Alternative Backup Bidders | Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and in consultation with their professionals, will be designated as the backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the date of the Sale Hearing (the "Outside Backup Date"), the Outside Closing Date, or the date of the closing of the transaction with the Winning Bidder.

Following the Sale Hearing, if the Winning Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Winning Bidder, the Debtors may designate the Backup Bidder to be the new Winning Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Winning Bidder's |

| | deposit shall be forfeited to the Debtors, and shall constitute liquidated damages from the defaulting Winning Bidder. The deposit of the Backup Bidder shall be held by the Debtors until the earlier of one (1) Business Day after (i) the closing of the transaction with the Winning Bidder; (ii) the Outside Backup Date; or (iii) the Outside Closing Date. |
|---|---|

**B.      The Expense Reimbursement**

30.      Pursuant to the Stalking Horse Agreement, the Sellers have agreed, subject to Bankruptcy Court approval, to provide the Buyers with the Expense Reimbursement, payable as set forth in the Stalking Horse Agreement.

31.      The Stalking Horse Agreement, including the Expense Reimbursement, was heavily negotiated between the Sellers and the Buyers, and the Expense Reimbursement represents an essential component of the Stalking Horse Agreement.  The Expense Reimbursement was required to induce the Buyers to enter into the Stalking Horse Agreement, and serves to secure the highest or otherwise best offer available to the Debtors and their estates for the Purchased Assets.

## <u>ASSUMPTION AND ASSIGNMENT PROCEDURES</u>

32.      The Debtors seek to establish the following procedures (the "<u>Assumption and Assignment Procedures</u>") authorizing them to assume and assign certain Executory Contracts and Unexpired Leases to the Winning Bidder and to notify counterparties to such Executory Contracts and Unexpired Leases of proposed cure amounts, if any, necessary to cure any defaults existing thereunder.

33.      No later than three (3) days following entry of the Bidding Procedures Order, Sellers shall serve the Cure Notice upon each non-Debtor counterparty to each Executory Contract of Unexpired Lease (the "<u>Contract Parties</u>" and each a "<u>Contract Party</u>") to which a Seller is a party, or by which a Seller is bound and that is used in, useful in, or related to any of the Purchased Assets, that may be assumed and assigned to the Stalking Horse Bidder.  The Cure Notice shall

15

identify the amounts, if any, the Debtors believe are owed to each such Contract Party in order to cure any defaults that exist under such Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code (said amounts being the "Cure Amounts").  The Cure Notice shall also state the date, time, and location of the Sale Hearing, and the date by which any objection to the assumption and assignment of any such Executory Contract or Unexpired Lease must be filed and served.  The inclusion of an Executory Contract or Unexpired Lease on the Cure Notice shall not obligate the Winning Bidder take assignment of such Executory Contract or Unexpired Lease. The Cure Notice will be substantially in the form attached hereto as **Exhibit C**.

34.     Any objection to the Cure Amount or to the assumption and assignment to the Stalking Horse Bidder or otherwise Winning Bidder, including with respect to adequate assurance of future performance of the Winning Bidder (collectively, a "Cure and Assignment Objection"), must be filed with the Court no later than ten (10) days from service of the Cure Notice (the "Cure and Assignment Objection Deadline"), and served, so as to be received the same day as the objection is filed, on (i) the Debtors; (ii) proposed counsel to the Debtors; (iii) counsel to the Secured Lender; (iv) counsel to the Stalking Horse Bidder; (v) counsel to the U.S. Trustee; (vi) holders of the twenty (20) largest unsecured claims against each Debtor; and (vii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002.

35.     To facilitate a prompt resolution of any Cure and Assignment Objections, the Debtors propose the following procedures:

a.    Any Cure and Assignment Objection must state the basis for such objection and state with specificity what each and every asserted default in any Executory Contract or Unexpired Lease and the monetary cure amount asserted by such Contract Party to the extent it differs from the Cure Amount, if any, specified by the Debtors in the Cure Notice, as applicable (in all cases with appropriate documentation in support thereof).  If no Cure and Assignment Objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in the Transferred Contract or other documents as of the date of the Cure Notice.  The Cure Notice shall also provide

that the Cure and Assignment Objection to any Cure Amount or assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Winning Bidder.  If a Winning Bidder that is not the Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and assignment only (solely on the grounds of adequate assurance of future performance) shall be extended to the Sale Hearing.

b.  Unless a non-Debtor party to any Transferred Contract files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be:

    i.  forever barred from objecting to the Cure Amount; and

    ii.  forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount on the schedule of the Cure Notice, against the Debtors or the Stalking Horse Bidder or any other assignee of the relevant contract or lease.

c.  Unless a non-Debtor party to any Transferred Contract files a timely objection to the assumption and assignment of the contract to the Stalking Horse Bidder, then such counterparty shall be deemed to have consented to the assumption and assignment to the Stalking Horse Bidder.

36.  If, at any time and from time to time after the entry of this Order, the Debtors or the Stalking Horse Bidder or other Winning Bidder identify additional Executory Contracts or Unexpired Leases to be assumed and assigned as Transferred Contracts in accordance with the terms of the Stalking Horse Agreement or the Winning Bidder's Proposed Asset Purchase Agreement, the Debtors shall serve a supplemental Cure Notice (each, a "Supplemental Cure Notice") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable Contract Party and its counsel (if known) no later than ten (10) days before the closing ("Closing") of the Sale, or, if such Executory Contract or Unexpired Lease is identified less than ten (10) days prior to the Closing, by the date set forth on the Supplemental Cure Notice.  Each Supplemental Cure Notice shall: (a) state the date, time and place of the Sale Hearing (or later hearing, if applicable); (b) state the date by which any objection to the assumption and assignment of such Transferred Contract must be filed and served; and (c) identify the proposed Cure Amount, if any.

## SALE NOTICE PROCEDURES

37.     The Debtors seek to have the Auction, if necessary, on February 22, 2021.  Within three (3) days of entry of the Bidding Procedures Order, the Debtors will serve by first class mail, copies of (i) the Bidding Procedures Order and (ii) the Sale Notice, in a form substantially similar to the Sale Notice attached hereto as **Exhibit D**, upon the following entities: (a) counsel to the Secured Lender; (b) the Office of the United States Trustee; (c) counsel to the Stalking Horse Bidder; (d) holders of the twenty (20) largest unsecured claims against each Debtor; (e) all parties-in-interest who have requested notice pursuant to Bankruptcy Rule 2002; (f) the United States Attorney's Office for the District of New Jersey; (g) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Motion; (h) all counterparties to any Executory Contract or Unexpired Lease of the Debtors; and (g) all Potential Bidders previously identified or otherwise known to the Debtors (collectively, the "Sale Notice Parties").

38.     Additionally, within seven (7) days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will publish or cause to be published a notice, setting forth the information contained in the Sale Notice, on one occasion, in either *The Star Ledger*, *The New York Times*, or *Wall Street Journal*.  The Debtors submit that such publication notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

39.     The Debtors submit that the proposed Sale Notice fully complies with Bankruptcy Rule 2002, is reasonably calculated to provide all interested parties with timely and proper notice, and constitutes good and adequate notice of the proposed Sale, the date, time and place of the

6244678

Auction, if any, all proceedings with respect thereto, the deadline for any objections to the Sale, and the date, time, and place of the Sale Hearing. Accordingly, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures set forth above.

40.    The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of New Jersey; and (d) be served on (i) the Debtors; (ii) proposed counsel to the Debtors; (iii) counsel to the Secured Lender; (iv) counsel to the Stalking Horse Bidder; (v) counsel to the US Trustee; (vi) the twenty (20) largest unsecured creditors of each Debtor; and (vii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, no later than February 17, 2021 at 4:00 p.m. (ET).

## MATERIAL TERMS OF THE PROPOSED SALE

41.    In accordance with Local Rule 6004-1(a)(3), the material terms of the proposed Sale to the Stalking Horse Bidder (or other Winning Bidder for the Purchased Assets) are as follows:

- **Sellers**. Festive Works, LLC and Marco Polo Restaurant & Tavern, Inc.

- **Property to be Sold**. The Purchased Assets consist of:

    a) certain lands lying in the City of Summit, County of Union, State of New Jersey designated as Block No. 402, Lot Nos. 1, 3 through 7, and 61 through 63 on the Tax Map of the City of Summit, Union County, New Jersey, as more specifically described on Exhibit A to the Stalking Horse Agreement (referred to below as the "Land");

    b) all buildings, structures, fixtures, and improvements presently located on the

6244678

Land (the "Improvements");

c)   all easements, licenses, rights, and appurtenances relating to the Land and the Improvements (the "Rights");

d)   if and to the extent assignable, all right, title, and interest of the Sellers, if any, in and to any intangible personal property relating to the Land and the Improvements, including, without limitation, all licenses, permits, plans, specifications, operating manuals, guarantees and warranties and any structural, engineering, soil, seismic, geologic, hydrogeologic, architectural, and other reports and studies prepared by third-party consultants relating to the Land and the Improvements (the "Intangible Property"); and

e)   all assets, including all real and personal property, as more specifically described on Exhibit B to the Stalking Horse Agreement, including the Liquor License, owned by Debtor Marco Polo Restaurant & Tavern, Inc. and used to operate the restaurant situated on the Land.

- **Date, Time, and Place of Sale**.  If the Sellers receive one or more Qualified Bids with respect to the Purchased Assets in addition to the Stalking Horse Bid, the Sellers propose to conduct the Auction for the Purchased Assets by videoconference, the details of which will be provided to Qualified Bidders in advance of the Auction, at **10:00 a.m. (ET) on February 22, 2021**, or such other date and location as shall be timely communicated by the Sellers to all entities entitled to attend the Auction.  The Debtors propose that the Sale Hearing be scheduled for **February 24, 2021 at 10:00 a.m. (ET)**.

- **Purchase Price**.  The consideration for Sale of the Purchased Assets to the Stalking

6244678

Horse Bidder pursuant to the Stalking Horse Agreement shall be equal to Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00) (the "Purchase Price"). The allocation of the Purchase Price pursuant to the Stalking Horse Agreement, as amended, shall be Three Million Two Hundred Twenty-Seven Thousand and 00/100 Dollars ($3,227,000.00) allocated to the Land, Improvements, Rights, and Intangible Assets, and Two Hundred Seventy-Three Thousand and 00/100 Dollars ($273,000.00) allocated to the Marco Polo Assets, consisting of Two Hundred Twenty-Three Thousand and 00/100 Dollars ($223,000.00) allocated to the Liquor License, and Fifty Thousand and 00/100 Dollars ($50,000.00) allocated to all other Marco Polo Assets.

- **Use and Occupancy Agreement**. On or before the Closing Date, Sellers and Buyers shall execute a use and occupancy agreement whereby the Debtors' management, with a new entity, shall be allowed to remain on the premises and continue to operate the Marco Polo Restaurant & Tavern, and said new entity shall pay rent of $10,000 per month to Buyers, subject to annual cost of living adjustments, for each whole month said new entity remains on the property and continues the restaurant operations, with any occupancy less than a full month being prorated accordingly.

- **Transfer of Liquor License**. Buyers and Sellers acknowledge that the Closing shall take place irrespective of the Buyer's ability to secure all required state and municipal approvals for transfer of the Liquor License, currently owned by Marco Polo and part of the Marco Polo Assets, prior to the Closing Date. To the extent all state and municipal approvals for transfer of the Liquor License to Buyer are not

21

acquired prior to the Closing Date, the Two Hundred Twenty-Three Thousand and 00/100 Dollars ($223,000.00) of the Purchase Price allocated to the Liquor License shall be placed in escrow until resolution of the Liquor License transfer approval process.  Said escrow shall be released to Sellers upon successful transfer of the Liquor License to Buyer; however, in the event the Buyer in unable to acquire the requisite state and municipal approvals to transfer the Liquor License, the escrowed Purchase Price allocated to the Liquor License shall be released to the Buyer and ownership of the Liquor License will revert to Sellers.  Sellers shall cooperate and work with Buyer to obtain the required approvals and finalize transfer of the Liquor License as needed, and Buyer shall use its best efforts to obtain the required state and municipal approvals to finalize transfer of the Liquor License.

- **Deadlines for Approval and Closing of Sale**.  The Sale Order shall be entered by February 24, 2021 and the Sale shall be closed by no later than February 26, 2021. Failure to close the contemplated Sale by or before February 26, 2021 constitutes a termination event of the Stalking Horse Agreement, unless the Buyers and Sellers mutually agree to extend the Outside Closing Date.

42.    In accordance with Local Rule 6004-1(b), the Stalking Horse Agreement and/or the Sale Order, as applicable, include the following "special provisions:"

- **Waiver, Release, or Satisfaction of Any Claim**.  In connection with the closing of the Sale, the Debtors and Stalking Horse Bidder will execute mutual releases (extending to each entities' respective affiliates, agents, attorneys, directors, officers, and employees), releasing each other from all causes of action, claims, and liabilities that either party has or may have against each other as of the Closing

6244678

Date.  *See* Sale Order, ¶¶ 11-15, 19.

- **Sale Free and Clear**.  The Stalking Horse Agreement provides that the Purchased Assets shall be sold to the Buyers free and clear of all liens, claims, interests, or encumbrances.  *See* Stalking Horse Agreement, § 6.  The Sale Order provides that as of the Closing, the Purchased Assets shall have been transferred to the Buyers free and clear of all Liens, Claims, and Interests, except to the extent set forth in the Stalking Horse Agreement.  *See* Sale Order, ¶ 7.

- **Relief from Bankruptcy Rules 6004(h) and 6006(d)**.  The Debtors seek a waiver of the 14-day stay of the effectiveness of the Sale order imposed by Bankruptcy Rules 6004(h) and 6006(d), respectively.  *See* Sale Order, ¶ 31.

## BASIS FOR RELIEF REQUESTED

A.  Approval of the Bidding Procedures is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors

43.    A paramount goal in any proposed sale of property of the estate is to maximize the proceeds received for the benefit of creditors. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that the debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (stating that the debtor has a "fiduciary duty to maximize the value of the bankruptcy estate"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").  Courts recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated*

6244678

*Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that bid procedures "encourage bidding and . . . maximize the value of the debtor's assets").

44.     In this case, the Bidding Procedures are appropriate under section 105(a) and 363 of the Bankruptcy Code.  The Debtors submit that the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order provide a fair, orderly, and uniform mechanism by which interested buyers and investors can submit offers for the Purchased Assets and will produce a competitive and fair bidding process that will yield the maximum value for the Debtors' estates, creditors, and stakeholders.  The Debtors believe that the Bidding Procedures will promote active bidding from interested parties, are not likely to dissuade any serious Potential Bidder, and will result in the highest and otherwise best offer reasonably available for such assets.  The Debtors, with the assistance of their professionals and advisors, have structured the Bidding Procedures to attract competitive and active bidding for the Purchased Assets.  The Bidding Procedures will allow the Debtors to conduct an Auction, if necessary, in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the financial wherewithal to close a transaction.  The Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their business judgment, the highest and best offer for the Purchased Assets.

45.     As outlined above, the Debtors, in conjunction with their professionals, have already engaged in an extensive prepetition marketing process.  The proposed timeline for the submission of competing bids will permit bidders to submit bids on or before February 17, 2021. Given that much, if not all, of the universe of potential bidders was identified and contacted months ago in an effort to solicit bids, it is highly likely that any Potential Bidders have (a) been aware of the potential sale of the Purchased Assets months before these chapter 11 cases were filed, and (b)

6244678

already had a sufficient and adequate opportunity to conduct due diligence and submit a bid within the proposed timeline.  Thus, the proposed timeline for the submission of competing bids and the entry of a Sale order is more than reasonable under the circumstances.  It also is necessary to preserve the going concern value of the Purchased Assets.

46.    The Bidding Procedures are consistent with other procedures routinely approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  *See, e.g., In re New England Motor Freight, Inc.*, Case No. 19-12809 (JKS) (Bankr. D. N.J. Apr. 8, 2019); *In re Aceto Corp.*, Case No. 19-13448 (VFP) (Bankr. D. N.J. Mar. 15, 2019); *In re Saint Michael's Medical Center, Inc., et al.,* Case No. 15-24999 (Bankr. D.N.J. Nov. 13, 2015); *In re Crumbs Bake Shop, Inc., et al.,* Case No. 14-24287 (Bankr. D.N.J. July 25, 2014); *see also In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. July 24, 2007).

*i.  Overbid Protections are Appropriate*

47.    The Initial Overbid and the Overbid increments are appropriate under the circumstances and will enable the Debtors to simultaneously maximize value while limiting the chilling effect in the marketing process.  This provision also is consistent with the overbid increments previously approved by courts in this circuit. *See, e.g., In re Seastar Holdings, Inc.*, Case No. 18-10039 (Bankr. D. Del. Jan. 29, 2018); *In re Peekay Acquisition, LLC*, Case No. 17-11722 (Bankr. D. Del. Sep. 7, 2017).

*ii.  The Expense Reimbursement Should be Approved*

48.    Bid incentives such as the Expense Reimbursement encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary

6244678

due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process. The Debtors submit that approval of the Expense Reimbursement is justified by the facts and circumstances of these cases, whether considered under the business judgment rule or administrative expense rule. Moreover, the Expense Reimbursement is a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement. The Stalking Horse Bidder has put forth considerable time and resources to negotiate the Stalking Horse Agreement, which will serve as a floor price at the Auction and, regardless of whether other Qualified Bids are received, will benefit the Debtors' estates. The Debtors believe that the Expense Reimbursement is fair and reasonable in view of (a) the analysis and negotiation undertaken by the Stalking Horse Bidder in connection with the transaction and (b) the fact that, if the Expense Reimbursement is triggered, the Stalking Horse Bidder's efforts will have influenced the chances that the Debtors will receive the highest or otherwise best offer for the Purchased Assets to the benefit of all of the Debtors' stakeholders.

49.    Approval of the Expense Reimbursement is governed by the standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *O'Brien*, the Third Circuit concluded that "the determination whether bidding incentives are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of [these fees] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535. In *O'Brien*, the Third Circuit identified two instances in which such a benefit to the estate may be found. First, a benefit may be found if the bidding incentive promotes a more competitive bidding process, "such as by inducing a bid

that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537.  Second, "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

50.     In recognition of the expenditure of time, energy and resources as well as the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid and setting a floor price at the Auction, promoting additional competitive bidding and by increasing the likelihood that the ultimate sale price will reflect the true value of the Acquired Assets, the Debtors submit that approval of the Expense Reimbursement is warranted for the Stalking Horse Bidder. The Debtors' ability to offer the Expense Reimbursement enables the Debtors to ensure the sale of the Purchased Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of a greater return to the estate. Moreover, the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressures.

51.     Additionally, a significant portion of the expenditures made by the Stalking Bidder included obtaining a necessary "Phase II Assessment" to determine if any Recognized Environmental Conditions, as that term is defined by the New Jersey Department of Environmental Protection, are present on the Land.  The results of the Phase II Assessment have been received, no Recognized Environmental Conditions requiring remediation exist on the Land, and the Phase II Assessment report will be provided to all Potential Bidders as part of their due diligence materials upon executed of a non-disclosure agreement as set forth in the Bidding Procedures.

6244678

52.     The Debtors and the Stalking Horse Bidder each have acted in good faith throughout this process. The amount of the Expense Reimbursement, up to $45,000, is not so high that it would cause any chilling effect on other prospective buyers, and will have no adverse effect on any creditors.

53.     Absent authorization of the payment of the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest and best available offer for the Purchased Assets and the downside protection that will be afforded by the Stalking Horse Agreement.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the Debtors will receive the best possible price for the Purchased Assets. Furthermore, approval of the Bidding Procedures, including the Expense Reimbursement, is required by the Stalking Horse Agreement as a condition to the Stalking Horse Bidder's obligation to proceed with the transaction contemplated in the Stalking Horse Agreement. *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

54.     In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Expense Reimbursement.  The Debtors' payment of the Expense Reimbursement under the circumstances described herein is (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtors' estates and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder.  Thus, the Debtors request that the Court approve and authorize payment of the Expense Reimbursement pursuant to the terms of the Stalking Horse Agreement.

6244678

B.   The Debtors Should Be Authorized to Sell their Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code

55.    Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the ordinary course of business and provides as follows: "[t]he trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).[7]

56.    Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

57.    Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b)(1) to require a finding by the Bankruptcy Court that the acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good faith purchaser" standard to mean one who purchases "in good faith" and for "value."  *Abbotts Dairies*, 788 F.2d at 147.

58.    The Third Circuit in *Abbotts Dairies* then analogized the bona fides of a Section 363(b)(1) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

---

[7] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary course of business to be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

6244678

*Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

59.     Finally, the Court noted that "[t]raditionally, courts have held that '[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the appraised value of the assets.'" *Abbotts Dairies*, 788 F.2d at 149; *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

60.     Respectfully, the sale of the Acquired Assets in accordance with the Stalking Horse Agreement and Bidding Procedures satisfies the *Abbotts Dairies* test.  First, the Debtors have fully disclosed and requested the Court's approval of the Bidding Procedures and all the terms and conditions of the Sale and proposed Auction, and intend to provide comprehensive notice of the Sale as discussed below.  *See In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles, including whether there has been full disclosure to the Bankruptcy Court).  The Debtors marketed the Purchased Assets prepetition, and will continue to do so post-petition, and negotiated in good faith with the Stalking Horse Bidder at arms-length, ultimately leading to the execution of the Stalking Horse Agreement.

61.     The Debtors believe that the Purchase Price for the Purchased Assets being provided under the Stalking Horse Agreement, represents reasonably equivalent value and fair consideration for the Purchased Assets.  Lastly, the Debtors are hopeful that as a result of their intended notice of the Sale to all potentially interested parties and marketing of the Purchased Assets post-petition, interested purchasers will be encouraged to submit bids, attend the Auction, and generate a spirited bidding process.

62.     In addition to the *Abbotts Dairies* requirements (which, respectfully, the Debtors clearly satisfy), courts typically require a sound business purpose to sell assets outside of a plan of

reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15,21 (Bankr. E.D. Pa. 1987).

63.     Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) adequate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. *Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor's showing of sound business justification need not be unduly exhaustive. Rather, a debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

64.     Consideration of the above factors here unequivocally establishes that the Sale should be approved. Based on the Debtors' prepetition marketing efforts and those that will continue post-petition, the Debtors will have, under the circumstances, amply marketed the Purchased Assets before the proposed date of the Sale Hearing. The Debtors have proposed Bidding Procedures designed to maximize the purchase price for the Purchased Assets. Those Bidding Procedures and the form and manner of notice of the Sale will ensure that any and all

31

interested parties will receive adequate notice of the Auction to allow for a competitive sale process.

66.     Absent the Sale, whether to the Stalking Horse Bidder or to another party, the Debtors may have to cease its operations, employees will lose their jobs, businesses will lose the Debtors as a customer from which to generate revenue and the Secured Lender, as creditor, will incur significantly greater losses if they had to foreclose on and liquidate their collateral in a disorderly, piecemeal fashion.  For all these reasons, the Debtors respectfully submit that the Sale of the Purchased Assets is supported by sound business reasons, and is in the best interests of the Debtors and their estates. Accordingly, the Debtors request approval of the Sale to the Stalking Horse Bidder pursuant to section 363(b) of the Bankruptcy Code.

C.     The Debtors Should be Authorized to Sell their Assets Free and Clear of Liens, Claims and Interests Pursuant to Section 363(f) of the Bankruptcy Code

66.     The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

      a.  applicable non-bankruptcy law permits sale of such property free and clear of such interest;
      b.  such entity consents;
      c.  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
      d.  such interest is in bona fide dispute; or
      e.  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

67.     This statute authorizes the sale of assets "free and clear of any interest."  The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code.  The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in *Folger Adam Sec.*

*v. DeMatteis/MacGregor*, JV, 209 F.3d 252, 258 (3d Cir. 2000).  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards a "broader interpretation which includes other obligations that may flow from ownership of the property." *Id*. at 258.  In turn, the *Folger Adam* Court cited with approval the Fourth Circuit's ruling in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

68.     The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Purchased Assets.  In particular, section 363(f)(2) will be met in connection with the transactions proposed because the Debtors expect that each of the parties holding liens, claims or encumbrances on the Purchased Assets will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale.  Indeed, the Purchase Price is more than sufficient to eclipse the entirety of the Secured Lender's lien.

69.     Accordingly, the Debtors request that the Acquired Assets be sold and transferred to the Stalking Horse Bidder free and clear of all Liens and Claims pursuant to section 363(f) of the Bankruptcy Code (other than Liens and Claims specifically assumed or created by the Stalking Horse Bidder).

   D.   The Form and Manner of Notices Should Be Approved

70.     The Debtors are required to notify creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Sale, the date, time, and place of the Sale Hearing, and the deadlines for filing any related objections.  The

Debtors submit that the Sale Notice, substantially in the form attached hereto as Exhibit D, complies with Bankruptcy Rule 2002 and provides reasonable, timely, and adequate notice of the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing, and the relevant deadlines for any objections thereto, to the Debtors' creditors and all other parties-in-interest that are entitled to such notice.  Further, the Debtors submit that the proposed sale objection deadline is reasonable and appropriate under the circumstances, and provides parties in interest with adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

71.     Accordingly, the Debtors request that the Court approve the notice procedures and objection deadlines set forth in this Motion, including the form and manner of service of the Sale Notice, and that no other or further notice of the Sale, the Bidding Procedures, or the Auction is required.

E.   Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

72.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

73.     Section 363(n) of the Bankruptcy Code, among other things, provides that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  The Third Circuit in *Abbotts Dairies* noted the kind of misconduct that would destroy a buyer's good faith.  *Abbotts Dairies*, 788 F.2d at 147.

74.     The Stalking Horse Agreement represents a negotiated, arms'-length transaction, in

34

6244678

which the Stalking Horse Bidder has acted in good faith, without collusion or fraud of any kind.

The transaction contemplated under the Stalking Horse Agreement is valued at $3.5 million. The

Purchase Price is higher than what the Debtors believe they could recover in a liquidation.

Therefore, the Debtors respectfully request that the Court find that the Buyers have purchased the

Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and

is entitled to the protections of sections 363(m) and 363(n) of the Bankruptcy Code as reflected in

the Sale Order. If a party other than the Stalking Horse Bidder emerges as the Winning Bidder,

the Debtors intend to make the appropriate showing at the Sale Hearing that such Winning Bidder

satisfies the requirements of "good faith" and similarly is entitled to relief under sections 363(m)

and 363(n).

F. <u>The Assumption and Assignment Procedures are Appropriate</u>

75.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-

possession "subject to the court's approval, may assume or reject any executory contract or

[unexpired] lease of the debtor." 11 U.S.C. § 365(a). The Debtors respectfully submit that the

proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to

provide the Contract Parties with adequate notice of the proposed assumption and assignment of

the applicable Executory Contract or Unexpired Lease, as well as proposed Cure Amounts, if

applicable. Such Contract Parties will then be given an opportunity to object to such notice. The

Assumption and Assignment Procedures further provide that, in the event an objection is not

resolved, the Court will determine related disputed issues (including any adequate assurance of

future performance issues). Accordingly, the Debtors submit that implementation of the proposed

Assumption and Assignment Procedures is appropriate in these chapter 11 cases.

76.     The Assumption and Assignment Procedures comport with the requirements of

6244678

Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved. The Debtors respectfully submit that the notices required by the Assumption and Assignment Procedures are sufficient to assume and assign any Transferred Contracts because they are reasonably tailored to provide notice and an opportunity to object to the proposed assumption and assignment. Thus, the Debtors submit that the Assumption and Assignment Procedures should be approved.

G. Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Authorized

77.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

78.    The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (citing *In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). "More exacting scrutiny would slow the administration of the debtor's estate

6244678

and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

79.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."   11 U.S.C. § 365(f)(2).   Section 365(b), which codifies the requirements for assuming an executory contract or unexpired lease, provides, in pertinent part that the debtor may only assume an executory contract or unexpired lease if it:

> (A)     cures, or provides adequate assurance that the [debtor] will promptly cure, [any defaults existing under the contract or lease];
>
> (B)     compensates, or provides adequate assurance that the [debtor] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

80.     Although undefined by the Bankruptcy Code, adequate assurance is guided by "a practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1995)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations").   Although no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *Carlisle Homes*,

103 B.R. at 538. Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

81.     The Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of certain Executory Contracts and Unexpired Leases to the Stalking Horse Bidder or other Winning Bidder. The Debtors further request that the Sale Order provide that the Transferred Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or other Winning Bidder notwithstanding any provisions in such contracts or leases, including those described in sections 365(f)(1) and (f)(3) of the Bankruptcy Code, that may prohibit such assignment.[8]

82.     The Bidding Procedures specifically require any Qualified Bid to contain information concerning a Qualified Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases to be assumed and assigned under such bid. Counterparties to the Transferred Contracts who are unsatisfied with the proposed adequate assurance of future performance by the Winning Bidder will be able to file an objection with respect thereto.

83.     To the extent necessary, the Debtors will present facts at the Sale Hearing to show

---

[8] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." Id. § 365(f)(3).

6244678

the financial wherewithal, willingness, and ability of the Stalking Horse Bidder or other Winning Bidder to perform under the Transferred Contracts. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Winning Bidder to provide adequate assurance of future performance as required under section 365(f)(2)(B) of the Bankruptcy Code.

84.   Further, as set forth above, the Cure Notice to be sent to all Contract Parties will include the amounts the Debtors believe are necessary to cure any defaults under the Transferred Contracts in accordance with section 365(b) of the Bankruptcy Code. Accordingly, the Debtors have satisfied the requirements of section 365 of the Bankruptcy Code with respect to the assumption and assignment of the Transferred Contracts.

H.   Request For Relief Under Bankruptcy Rules 6004(h) and 6006(d)

85.   Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order be effective immediately by providing that the fourteen 14 day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

86.   The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen

39

(14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy ¶¶ 6004.11, 6006.04 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

I.    Waiver of Memorandum of Law

87.    Because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Debtors respectfully request that the Court waive the requirement of D.N.J. LBR 9013-1 that all motions be accompanied by a separate memorandum of law.

J.    No Prior Request

88.    No prior request for the relief sought herein has been made to this or to any other court.

89.    Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

**NOTICE**

90.    The Debtors respectfully requests that they be authorized to provide notice of the Motion by hand, overnight mail, first class mail, facsimile or by electronic mail, upon: (i) Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, 1085 Raymond Boulevard, Newark, NJ 07102, (ii) holders of the twenty (20) largest unsecured claims against each Debtor, (iii) counsel to Unity Bank, Norris McLaughlin, P.A., 400 Crossing Blvd., 8th Floor, Bridgewater, NJ  08807-5933, Attn: Jerome Gallagher, Esq., (iv) the Internal Revenue

6244678

Service, 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016 (overnight mail address), (v) the United States Attorney, Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, New Jersey, (vi) the United States Attorney General, United States Department of Justice, Ben Franklin Station, P.O. Box 683, Washington DC 20044, (vii) the Office of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, P.O. Box 112, Trenton, NJ 08625, (viii) Division of Taxation, New Jersey Division of Taxation, Compliance and Enforcement - Bankruptcy Unit, 50 Barrack Street, 9th Floor, P.O. Box 245, Trenton, NJ 08695-0267, (ix) any purported secured creditors, (x) those parties who have filed a notice of appearance and request for service of pleadings in these cases pursuant to Fed. R. Bankr. P. 2002, and (xi) counsel for the Stalking Horse Bidder, Law Offices of John L. Sweeney, 51 Dumont Place, Morristown, NJ 07960 (Attn: John L. Sweeney).  The Debtors respectfully submit that such notice is sufficient under the circumstances.

6244678

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (ii) enter the Sale Order after the Sale Hearing, substantially in the form attached hereto as **Exhibit E**, authorizing the Sale of the Purchased Assets to the Winning Bidder, and (iii) grant such other relief as the Court deems just and appropriate under the circumstances.

Dated: January 20, 2021                       Respectfully submitted,

**PORZIO, BROMBERG & NEWMAN, P.C.**
*Proposed Counsel to the Debtors and Debtors-In-Possession*


By: */s/      John S. Mairo*
    John S. Mairo
    Christopher P. Mazza
    100 Southgate Parkway
    P.O. Box 1997
    Morristown, New Jersey 07962
    (973) 538-4006
    (973) 538-5146 Facsimile
    Email: (jsmairo@pbnlaw.com)
           (cpmazza@pbnlaw.com)

6244678