| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>John S. Mairo, Esq. (jsmairo@pbnlaw.com)<br>Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)<br>*Proposed Counsel to Debtors and Debtors-In-Possession* | |
| In re:<br><br>FESTIVE WORKS, LLC, *et al.*,[1]<br><br>                Debtors. | Chapter: 11<br><br>Case No.: 21-10445 (JKS)<br><br>(Joint Administration Pending) |

**DECLARATION OF AGAPIOS KYRITSIS IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

    I, Agapios Kyritsis, make this Declaration under 28 U.S.C. § 1746:

    1.    I am the Managing Member of debtor Festive Works, LLC ("Festive Works") and President of debtor Marco Polo Restaurant & Tavern, Inc. ("Marco Polo", together with Festive Works, the "Debtors"). I have held those positions since 2018. As such, I am familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of the above-captioned debtors chapter 11 cases (the "Chapter 11 Cases").

    2.    I submit this Declaration in support of first day motions (the "First Day Motions") that the Debtors have filed concurrently herewith to enable the Debtors to operate effectively and minimize potential adverse effects in the Chapter 11 Cases. Except as otherwise indicated herein,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number are: Festive Works, LLC (3067) and Marco Polo & Restaurant Tavern, Inc. (6324).

6244799

the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. I am authorized to submit this Declaration on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3. To briefly summarize the contents of this Declaration, section I provides an overview of the Debtors' business, the circumstances that precipitated the commencement of the Chapter 11 cases, and the Debtors' objectives in the Chapter 11 Cases. Section II describes the Debtors' pre-petition capital structure. Section III provides a summary of the First Day Motions.

**I.    Overview, Precipitating Factors, Chapter 11 Objectives**

   A.    Overview

4. The Debtors manage one of Summit, New Jersey's longest operating restaurants, namely, Marco Polo. Originally founded in 1934, Marco Polo has been serving residents of Summit and the surrounding areas for over eighty (80) years. The Debtors own the real estate and building in which the following services have been provided: in-person dining, take-out dining, personal and corporate catering, and banquet hall venue for large gatherings. A downturn in revenue related to decreased business, significantly exacerbated by the ongoing COVID-19 pandemic, has rendered the Debtors unable to meet their obligations. To maximize value for all interested parties, the Debtors have initiated these Chapter 11 Cases to pursue a sale process with a stalking horse bidder.

   B.    Precipitating Factors

      i.    *Unity/State Court Litigation*

5. Even before COVID-19, the Debtors' business was having financial difficulties due

to reduced revenue and an inability to meet their obligations. In 2019, the Debtors defaulted on their monthly payment obligation to secured lender Unity Bank. In February 2020, Unity Bank initiated: (i) a proceeding to foreclose on its real estate collateral owned by the Debtors (the "Foreclosure Proceeding"); and (ii) an action for a money judgment based on its promissory note with the Debtors and guaranty with my mother and me (the "Note Action", together with the Foreclosure Proceeding, the "Unity/State Court Litigation").

6. In November 2020, Unity Bank filed a motion to strike the Debtors' answer in the Foreclosure Proceeding and a motion for summary judgment in the Note Action. The Debtors sought adjournments of each of the motions and Unity Bank opposed each request. The respective state courts granted short adjournments to the Debtors; the hearings for these motions are currently scheduled for January 23, 2021, which has, in part, prompted the timing of the commencement of these Chapter 11 Cases.[2]

### ii. Preserving Timeline With $3.5 Million Stalking Horse Bidder

7. To address issues raised by the Unity/State Court Litigation and to maximize value for all interested parties, the Debtors retained a broker/auctioneer to market the Debtors' assets in May 2020. The assets marketed consist of, *inter alia*, (i) the real property and improvements located at Block 402, Lots 1, 3-7 & 61-63 in Summit, New Jersey 07901 (the "Land"); (ii) all intangible personal property relating to the Land (the "Intangible Property"); (iii) all tangible personal property used in connection with the restaurant operated out of such location ("Restaurant Property"); and (iv) the plenary retail consumption liquor license #2018-33-011-006 ("Liquor License"). Festive Works owns the Land and Intangible Property; Marco Polo owns the Restaurant Property and Liquor License.

---

[2] On or about December 31, 2020, proposed counsel to the Debtors advised Unity Bank's counsel that the Debtors intended to commence these Chapter 11 Cases in advance of the hearing, which were scheduled for January 8, 2021.

8.      Immediately upon its engagement, the Debtors' broker/auctioneer embarked on a robust, but targeted, campaign to cultivate prospects that were interested in purchasing either all or part of the Debtors' assets and, if possible, becoming a stalking horse bidder in connection with a potential sale pursuant to section 363 of the Bankruptcy Code.  These efforts resulted in identification of, and negotiations with multiple interested parties, culminating with one of those parties, the stalking horse bidder, being recognized as the best potential suitor for the Debtors' assets.

9.      The Debtors and the stalking horse bidder went through multiple rounds of negotiations, with the stalking horse bidder increasing its total offer price to $3.5 million as part of the sale contract's second amendment executed on December 18, 2020.  After thoroughly evaluating all alternatives available, the Debtors, in consultation with their professionals, determined that the proposed sale of the assets to the stalking horse bidder was the best option available to the Debtors to maximize the value of such assets for the benefit of the Debtors' estates and creditors.  Although Unity Bank was made aware of the marketing process and stalking sale agreement, Unity Bank has not expressed interest in reviewing the stalking horse sale agreement (even though the Debtors offered to make it available), but rather advised the Debtors it would review the sale pleadings once these Chapter 11 Cases commenced, which is consistent with Unity Bank's previous position that it "would accept a short payment in exchange for a discharge of its mortgage and dismissal of its [Foreclosure Proceeding]" and the Debtors (and guarantors of the debt) would "remain liable for the deficiency balance…"[3]

10.     The transaction negotiated with the stalking horse bidder is the culmination of a thorough, fair, arms-length and robust prepetition marketing process.  The Debtors believe that,

---

[3] The communication from Unity Bank's counsel setting forth that position is attached as Exhibit A to the Cash Collateral Motion being filed simultaneously.

4

6244799

taken as a whole, the terms of the proposed sale of the assets to the stalking horse bidder is fair and reasonable, and that the stalking horse bid represents the highest and best offer for the assets available to the Debtors at this time, subject to any higher and otherwise better offers that may be received during any post-petition marketing process.

11. The securing of a $3.5 million stalking horse bid for the Debtors' assets is an admirable achievement under normal circumstances; but in the middle of a global pandemic, it is an extraordinary accomplishment. Under the terms of the sale contract with the stalking horse bidder, the "outside" date to close the transaction is February 26, 2021.

12. Accordingly, to avoid adverse rulings in the Unity/State Court Litigation and to preserve the timeline agreed to with the stalking horse bidder, the Debtors have initiated these Chapter 11 Cases to move forward with the stalking horse bidder transaction, subject to higher and better offers.

C.  Chapter 11 Objectives

13. With these Chapter 11 Cases, the Debtors intend to continue operating as a going concern to preserve their assets pending the sale transaction. While COVID-19 has essentially shut down parts of the business, e.g., banquet hall events for large groups, the Debtors have been able to pivot and generate revenue through a strong take-out business. The Debtors currently have twelve (12) employees that will continue to be employed through the sale process.

14. Additionally, and most importantly, the Debtors will utilize the Chapter 11 Cases to have a sale process which maximizes value for all interested parties. The stalking horse bidder has completed its due diligence (including environmental testing) and has worked with the Debtors in amending the sale agreement to make these Chapter 11 Cases possible. Specifically, the stalking horse bidder, as part of the sale contract's second amendment to the sale agreement, increased the

purchase price by $300,000 (from $3.2 million to $3.5 million) and agreed to allow a portion of its good faith deposit to fund the Debtors' professionals.  This was necessary because the stalking horse agreement requires a section 363 sale so the assets can be delivered "free and clear" of liens, however, the Debtors' professionals needed to funded to prepare for the Chapter 11 Cases and conduct a sale process.  The Debtors did not have resources to provide such funding, thus, the agreement embodied in the sale contract's second amendment benefits all creditors since it allows the Debtors to move forward with the stalking horse bidder, subject to higher and better offers.  With the stalking horse agreement as amended in place, the stage has effectively been set to maximize the value of the Debtors' assets through the contemplated sale process.

15. Lastly, the Chapter 11 Cases will be utilized to centralize and assess the claims asserted against the Debtors, as part of the Debtors' formulation of a plan.

**II.     Debtors' Pre-Petition Capital Structure**

A.     Unity Bank – Secured Debt

16. On or about December 28, 2017, Unity Bank made a loan to Festive Works and Marco Polo, as borrowers, in the original principal amount of $2,879,000.00 (the "Unity Bank Loan").  The Unity Loan is authorized by the U.S. Small Business Administration (the "SBA") and bears SBA Loan # 16787570-05.  The Unity Bank Loan is further evidenced by a certain SBA Note, dated December 28, 2017, executed by the Debtors in the principal amount of $2,879,000.00 (the "Note").

17. To secure the Note, Marco Polo executed and delivered to Unity Bank a Security Agreement dated December 28, 2017 (the "Security Agreement"), pursuant to which Marco Polo granted to Unity Bank a security interest in Marco Polo's then existing and thereafter acquired inventory, chattel paper, accounts, deposit accounts, instruments, documents, equipment, general

6

intangibles, fixtures, together with all replacements, accessions, proceeds and products (collectively, the "Collateral"), as more particularly described therein.

18. On December 29, 2017, Unity Bank filed a UCC-1 Financing Statement in the office of the State of New Jersey, Department of the Treasury, Division of Revenue & Enterprise Services, UCC Section, under Filing Number 52575671.

19. To further secure the Note, Festive Works executed a Mortgage dated December 28, 2017 (the "Mortgage") on certain real property owned by Festive Works located at 527, 531-533 and 535 Morris Avenue; 42 and 44 Plain Street; and 6, 8 and 10 Aubrey Street, Summit, New Jersey (collectively, the "Mortgaged Premises"). On January 25, 2018, the Mortgage was recorded in the Office of the Union County Clerk as Instrument No. 652771.

20. In the pleadings recently submitted by Unity Bank in the Unity/State Court Litigation, Unity Bank has asserted a principal balance due of $2,802,028.10.

B. Other Debts/Claims

21. In addition to the Unity Bank debt discussed above, at least six additional UCC-1 financing statements are filed against one or more of the Debtors' assets, but the Debtors believe the underlying debts may have been paid or waived. Additionally, there are approximately $300,000 in tax liens, and approximately $1.8 million in judgments entered against one (or both) of the Debtors. The Debtors believe some of these debts, specifically the tax amounts, have been paid. Most vendors are providing goods and services on a cash-in-advance or cash-on-delivery basis.

C. Equity/Ownership

22. Festive Works is a limited liability company; 49% of the membership interests are held my mother, while 51% are held by me. Marco Polo is a c-corporation; its equity is owned

49% by my mother and 51% is held be me.

### III.    First Day Motions

23.    To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to preserve and maximize the value of the Debtors' estates, the Debtors have filed or are filing the following First Day Motions:

- Debtors' Application For Expedited Consideration Of First Day Matters;
- Debtors' Motion For An Order Directing Joint Administration Of The Debtors' Chapter 11 Cases;
- Debtors' Motion For Interim And Final Orders Under Sections 361 And 363 Of The Bankruptcy Code (A) Approving The Use Of Cash Collateral, (B) Granting Adequate Protection, (C) Setting A Final Hearing, And (D) Granting Related Relief;
- Debtors' Motion For Entry Of An Interim And Final Order Pursuant To 11 U.S.C. §§ 105(A) And 507(A)(4) (I) Authorizing But Not Directing The Debtors To Pay Prepetition Wages, Salaries, Compensation, Benefits And Reimbursable Business Expenses And Related Costs, And (II) Directing All Banks To Honor Checks For Payment Of Employee Obligations;
- Debtors' Motion For Entry Of (I) An Order (A) Authorizing And Approving Bidding Procedures In Connection With The Sale Of Substantially All Of The Debtors' Assets Pursuant To The Stalking Horse Agreement; (B) Authorizing And Approving Expense Reimbursement Related Thereto; (C) Approving Procedures For The Assumption And Assignment Of Executory Contracts And Unexpired Leases; (D) Scheduling A Sale Hearing;(E ) Approving The Form And Manner Of Notice Thereof; And (II) An Order (A) Authorizing And Approving The Sale Of Certain Of The Debtors' Assets Free And Clear Of All Claims, Liens, Rights, Interests, And Encumbrances, (B) Authorizing And Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases Related Thereto, And (C) Granting Related Relief;
- Debtors' Motion For Entry Of Interim And Final Orders Authorizing The Debtors To Maintain Prepetition Cash Management System, Use Existing Business Forms, And Granting Related Relief;
- Debtors' Motion For Interim And Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering Or Refusing Service On Account Of Prepetition Invoices, (II) Deeming Utility Companies To Have Adequate Assurance Of Future Payment, And (III) Establishing Procedures For Resolving Requests For Additional Assurance Pursuant To 11 U.S.C. §§ 105(a) And 366; and
- Debtors' Motion (I) Authorizing, But Not Directing, The Debtors To Honor Certain Pre-Petition Obligations To Customers And Continue, Renew, Replace, Modify, Implement Or Terminate Customer Programs In The Ordinary Course Of Business,

   And (II) Authorizing And Directing Financial Institutions To Honor All Non-Cash Payments And Obligations Related Thereto.

24. I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference and verify as true each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable to the Debtors to preserve and maximize value of their estates with minimal disruption and delay.

*[Signature Page Follows]*

6244799

Dated: January 20, 2021

_____
Agapios Kyritsis

6244799